# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
December 5, 2011 Session

## SARAH C. JANNERBO v. E. MATTIAS JANNERBO

**Appeal from the Circuit Court for Hamilton County**
**No. 09D1051      Jacqueline S. Bolton, Judge**

---

**No. E2011-00416-COA-R3-CV-FILED-MARCH 9, 2012**

---

This appeal arises from the divorce of Sarah C. Jannerbo ("Wife") and E. Mattias Jannerbo ("Husband"). Wife sued Husband for divorce in the Circuit Court for Hamilton County ("the Trial Court"). The Trial Court granted the parties a divorce. Following a trial, the Trial Court, *inter alia*, divided the marital estate and awarded Wife periodic alimony. Husband appeals, arguing that the Trial Court erred in awarding both the type and amount of alimony that it did. Husband also argues that the Trial Court erred in its classification and division of the marital estate. Wife raises her own issue of whether she should have been awarded her attorney's fees. We find that the Trial Court erred in awarding Wife periodic alimony. We instead find that Wife should be awarded rehabilitative alimony in an amount lower than that awarded by the Trial Court. We find that the Trial Court did not err in its classification or division of the marital estate. We further find that the Trial Court did not err in declining to award Wife her attorney's fees. We affirm the judgment of the Trial Court as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Steven M. Jacoway and McKinley S. Lundy, Jr., Chattanooga, Tennessee, for the appellant, E. Mattias Jannerbo.

John P. Konvalinka and Jillyn M. O'Shaughnessy, Chattanooga, Tennessee, for the appellee, Sarah C. Jannerbo.

# OPINION

## Background

In 2009, Wife sued Husband for divorce. Wife and Husband have two minor children. In February 2010, the Trial Court ordered Husband to pay Wife $7,000 per month in temporary child support and alimony. The trial in this case was held over the course of several days in August, September, and October 2010. Aware of all the evidence presented, we will concentrate on the testimony of Wife and Husband.

Wife testified. Wife was born in 1969 in Chattanooga, Tennessee. Wife attended Baylor high school and later graduated from the University of Tennessee at Chattanooga ("UTC") with a degree in International Studies and French. As part of her French studies, Wife studied abroad. While studying in France in the early 1990s, Wife met Husband, and they began dating. Husband attended classes with Wife. When Wife completed that school year, Husband, a native of Sweden, returned to the United States with her. Husband then attended UTC and earned a degree in economics.

Husband went on to attend the University of Tennessee law school in Knoxville. In 1993, Wife and Husband married. Wife and Husband moved to Knoxville. Wife testified that, at the time of her marriage, her father gave her $27,000. Wife had perhaps $36,000 already, as well. Wife stated that Husband had no money when they married. When the parties moved to Knoxville, Wife worked at the Sagebrush restaurant. Later, Wife worked at Bennett Galleries. The two temporarily moved back to Chattanooga while Husband worked at a clerkship. In 1995, Wife's brother died in a car accident. As a result of a settlement based on her brother's death, Wife received $25,000. Wife's father began giving Wife $1,000 per month. In 2001, Wife's father increased the gift to $2,000 per month. Wife testified that Husband completed law school in 1996.

Wife and Husband purchased a house on Graham Street in Chattanooga. Wife's father gave her $20,000 to use as a down payment for the purchase. After two years, the couple moved to Washington, D.C., where Husband earned an LLM at Georgetown. Wife testified that the couple then returned to Chattanooga and Husband eventually began work at the law firm of Miller & Martin. The couple bought a house on Lula Lake Road in Lookout Mountain, Georgia. Wife testified that her father gave her $60,000 to use as a down payment on this house. Wife stated that she stopped working outside the home after she had children. Regarding the handling of their finances, Wife stated:

> Mattias did all the financial. He did all the financial, everything. He did the
> bills. He did the banking. I was still, at this time, receiving my $2,000 a

month from my father, and that's - - that was the amount of money I had. That was my - - that's what I lived on. I did not receive, you know, any monthly money from Mattias.

Wife and Husband purchased another house. Located on Jo Conn Road in Lookout Mountain, Tennessee, the house had been in Wife's family for many years. Wife's father waived his one-third interest in the property. This property was worth over $300,000, and so the pair was able to buy the Jo Conn Road house for $220,000. Wife testified that she had received around $755,000 in financial support from her family.

In sum, Wife testified that under Husband's financial stewardship, the couple spent more than was prudent. Wife testified to Husband having spent large sums on nights out and on his pursuit of other women. Wife and Husband took on large debts, including through the use of a home equity line of credit ("HELOC"). By trial, Wife, who had worked minimally throughout the marriage, especially in its later stages, ran an online jewelry business with her sister. The jewelry business, however, was not yet significantly profitable. Wife, through her family, also has a 25% interest in Woodfield Properties. This conservation easement resulted in a tax benefit for Wife and Husband.

By 2008, Wife and Husband, experiencing serious problems with their marriage, undertook counseling. Wife stated that "we never went together anywhere" and "it all fell under what he wanted," in regards to why the two divorced. Since the time Wife filed for divorce, she applied for only one job at a school and relied on alimony and child support from Husband. Wife admitted to having had a relationship during the marriage with a "friend" named Colin who lived in New York.

Husband testified next. Husband is a U.S. citizen and a Swedish citizen. Husband testified that he suffered from a congenital heart defect, and had open heart surgery during his high school years. Husband stated that he had $200,000 in student loans and had all of the balance outstanding. Husband denied that his green card status factored into his decision to marry Wife. Husband testified that he brought no assets into the marriage. Husband disputed Wife's assertion that she had $36,000 at the time of marriage, stating the actual sum was around $15,000. Husband testified to his legal career development, from law clerk, to, as of the time of trial, equity partner at Miller & Martin, where he earned well over $200,000 per year.

Husband testified to a series of financial commitments that the couple embarked upon. Husband, however, did not endorse Wife's portrayal of the spending as Husband's exclusive recklessness. Husband admitted that he received a $68,000 loan from Wife's father and did not disclose this fact to her.

Following trial, the Trial Court entered an order, stating, in relevant part:

By Final Decree entered October 15, 2010, the Court has declared the parties to be divorced on stipulated grounds.

This Order will deal with the parenting issues, as well as the division of the parties' assets and liabilities. Parties were married on August 14, 1993, and separated in May 1, 2009. The Wife was twenty-four at the time of the marriage. Husband was twenty-six years of age. The parties have two minor children who are now six and ten years of age.

The parties met in undergraduate school and married shortly thereafter. Husband, during the marriage, obtain his law degree from the University of Tennessee and an advance tax degree from Georgetown University. The majority of his $200,000.00 plus debt for student loans was accumulated for his undergraduate degree and Husband estimates that eighty thousand in student loans was for his law degree and approximately eighteen thousand for student loans for the tax degree. The parties used proceeds from the sale of their marital home in Chattanooga to live on while in Washington, D.C. for approximately one year.

Though the amounts are disputed, it is unrefuted that the Wife received cash gifts from her family both before and during the marriage, including monthly gifts received directly to her from her father, monies received upon her brother's death, and at least one-hundred and ninety thousand dollars in gift down payments for the parties' marital homes. Though the Wife had this money in her separate account, it is also undisputed that the monies in her separate account were used for these down payments and also used for her living expenses, as well as that of the children during the course of the marriage. In 2006, the father of Wife, Jo Colmore, in lieu of the monthly payments which had been increased from $1,000 to $2,000 per month, established a tax credit which substantially reduced the taxes owed by the parties. This tax credit or gift was established through Wife's father, Jo Colmore, under the entities of Woodfield Properties, LP. Woodfield Properties are essentially two tracts of land, one located on Lookout Mountain and the other in Montana. Through her father's good graces, Wife enjoyed a twenty-five percent interest in Woodfield Properties, which was the source of the tax gift or credit which the parties derived on their income tax returns for at least 2007, 2008, and 2009. This tax credit was in the amount of approximately thirty-thousand dollars each of those years. The parties

received gifts of substantial down payments on both their Graham, Lula Lake and Jo Conn Road homes and the parties never lost money on the sale of Graham Street or Lula Lake homes. The Jo Conn Road property was purchased for substantially less that its asking price, the purchase price being $330,000.00 of which one-third or $110,000.00 was gifted by Wife's father to the parties. However, at the time of this divorce hearing, the Jo Conn house which was purchased for $220,000.00 had a $492,000.00 first mortgage and HELOC, and an additional $68,000.00 debt to Wife's father. To say that the parties live beyond their means is a gross understatement.

At the time of trial, Husband was a forty-four year old equity partner at the Miller & Martin Law Firm in Chattanooga. He had been a partner for three years and is on Tier 3 of a 12 tier plan. The Court specifically finds that the Husband's average income from tax returns presented at trial, is approximately $275,000.00.

Wife graduated from the University of Tennessee at Chattanooga studying French and International Studies. It was during her junior year abroad where she met Husband. Husband graduated from the University of Tennessee at Chattanooga in 1993 and majored in Economics and French receiving his degree *summa cum laude*. Husband was in the United States on a tourist visa and was denied a student visa. According to Wife, that was when the prospect of marriage presented itself.

Though Wife has tutored French and worked briefly at Scenic Land School, she never received her certified teacher's certificate. Wife presently owns a jewelry business with her sister, "Sarah Jannerbo Jewelry". The profit and loss statement for November 2009 through May 2010, showed a net income of $3,000.00.

Though the parties have had the benefit of excellent salaries and gifts, at the time of this hearing the parties were deeply in debt.

Days of testimony were spent with both sides attempting to show where the money went, but the only unrefuted fact in the case is that the Husband is the person who took care of all the finances of the parties and it is the Husband who wrote all the checks on the HELOC account which now has a balance of approximately $160,000.00. It is also unrefuted that Husband, unbeknownst to Wife, secured the additional loan from Wife's father of $68,000.00.

It is Wife's contention that throughout the marriage, she would ask Husband how their finances were holding up and his response according to her was that everything was "fine." Husband's contention, on the other hand, is that Wife signed each and every one of the loans which were made during the marriage and that she preferred just to keep her head in the sand. The testimony shows that for at least eleven of the seventeen years of marriage, Wife supported herself with monthly gifts from her father and then in 2006 when the tax gift was established, Husband began writing her a check for $2,000.00 per month for her expenses. Toward the end of the marriage, she did receive an American Express card from her Husband, which she used for family business, according to her testimony, but her annual charges never exceeded $15,000.00.

On the other hand, Husband's summary of expenses from 2008 to 2009 alone are $123,682.00, many of which are anything but necessities. (Exhibit 46)

Trial Exhibit 43 exhibits a pattern of excessive spending which includes nearly nine thousand dollars in one night on his American Express bill for "Babes" and "PP Bar and Grill." Though Husband has assumed responsibility to pay for the debts listed on Exhibit 43, it is obvious that it was Husband who was most enjoying the fruits of "living beyond our means."

\* \* \*

## ALIMONY

This is a seventeen year marriage. Wife has worked minimally during the marriage for minimal wages. Wife worked some during Husband's law school and tax school and later established her jewelry business with her sister. Wife has basically worked at home while Husband pursued his degrees and career.

Periodic Alimony is awarded in the amount of $7,000 per month. The Court based its award of alimony upon the factors as illuminated in T.C.A. §36-5-101:

1) The relative earning capacity, needs, obligations and financial resources of each party . . .; 2) The relative education and training of each party ...; 3) The duration of the marriage ...; 4) Standard of living of the parties established during the

-6-

marriage: and such other factors including tax consequences to each party.

Each of the parties shall pay their own attorneys fees. Costs are taxed to Defendant, for which execution may issue if necessary.

The Trial Court awarded Wife a net value of $195,008 of the marital estate, including the Jo Conn Road house. The Trial Court assigned $48,340 in net debt to Husband, including $160,000 in HELOC, the $68,000 loan from Jo Colmore, and Husband's Miller & Martin interest valued at $157,750. Husband's student loan debt was found to be $215,000 and assigned entirely to Husband as his separate debt.

Husband filed a motion to alter or amend. The Trial Court granted Husband's motion with respect to certain parenting issues, but otherwise denied it. Husband appeals.

## Discussion

Though not stated exactly as such, Husband raises four issues on appeal: 1) whether the Trial Court erred in its classification of the marital estate; 2) whether the Trial Court erred in its division of the marital estate; 3) whether the Trial Court erred in awarding Wife periodic alimony rather than rehabilitative alimony; and, 4) whether the Trial Court erred in granting Wife $7,000 per month in alimony. Wife raises the additional issue of whether the Trial Court erred in declining to award her attorney's fees.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in its classification of the marital estate. As our Supreme Court has explained:

Tennessee is a "dual property" state because its domestic relations law recognizes both "marital property" and "separate property." *See generally* Tenn. Code Ann. § 36-4-121; *Eldridge v. Eldridge*, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002). When a married couple seeks a divorce, the "marital property" must be divided equitably between them, without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1). "Separate

-7-

property" is not part of the marital estate and is therefore not subject to division. *See Cutsinger* [*v. Cutsinger*], 917 S.W.2d [238, 241 (Tenn. Ct. App. 1995)]. Thus, it is imperative that the parties, the trial court, or both identify all of the assets possessed by the divorcing parties as either marital or separate so that a proper division can be accomplished.

*Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009).

As pertinent to the issue now before us, Tenn. Code Ann. § 36-4-121 provides that "separate property" includes: "Property acquired by a spouse at any time by gift, bequest, devise or descent; …." Tenn. Code Ann. § 36-4-121 (b)(2)(D) (2010).

The inquiry does not end here, however, as separate property may in certain circumstances become marital. As our Supreme Court explained in *Snodgrass*:

[S]eparate property may be deemed marital by operation of law under theories of commingling or transmutation. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002).

\* \* \*

This Court addressed the related doctrines of commingling and transmutation for the first time in *Langschmidt* and adopted the following explanation:

[S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur . . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property . . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

-8-

81 S.W.3d at 747 (quoting 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (2d ed. 1987)).

*Snodgrass*, 295 S.W.3d at 247, 256.

Husband argues that the Trial Court erred when it assigned the entirety of Husband's student loan debt to him as his separate property. Husband contends that, while much of the student loan debt was incurred prior to the marriage, much of the student loan money went to support both parties. The evidence in the record does not clearly delineate which student loans funds were utilized prior to the marriage and which ones were utilized during the marriage. Barring such clear evidence, we find no reversible error in the Trial Court's assignment of Husband's student loan debt entirely to Husband as we do not find that the evidence preponderates against this finding.

We next address whether the Trial Court erred in its division of the marital estate. As our Supreme Court has explained:

This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

* * *

In a proceeding for divorce or legal separation, the trial court is authorized, prior to determining the support and maintenance of one party by the other, to "equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1) (2005). The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate. *See Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). The division of assets is not a mechanical process and trial courts are afforded considerable discretion. *Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001).

*Keyt v. Keyt*, 244 S.W.3d 321, 327-28 (Tenn. 2007) (footnote omitted).

Further, our Supreme Court has instructed:

[M]arital property must be divided equitably between the parties based on the relevant factors enumerated in Tennessee Code Annotated section 36-4-121(c) without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1). Section 36-4-121(a)(1) requires an *equitable* division of marital property, not an *equal* division. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002).

*Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010).

Tennessee Code Annotated § 36-4-121 (c) provides:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
(4) The relative ability of each party for future acquisitions of capital assets and income;
(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage

-10-

earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

      (6) The value of the separate property of each party;

      (7) The estate of each party at the time of the marriage;

      (8) The economic circumstances of each party at the time the division of property is to become effective;

      (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

      (10) The amount of social security benefits available to each spouse; and

      (11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121 (c) (2010).

We find the division of the marital estate in this case to be equitable. First, it is clear from the record that, notwithstanding the more than generous contributions from Wife's family, Husband dominated the financial decision making in this 17-year marriage. The record suggests that Husband and Wife, financially steered by Husband, established a lifestyle far beyond their means. Debt was incurred again and again in the course of purchasing homes and engaging in renovations, among many other things.

Husband also takes issue with specific aspects of the Trial Court's division of the marital estate. Husband argues that the Trial Court erred in failing to take into account the "remoteness" of Husband's interest in Miller & Martin. We disagree. The Trial Court heard evidence from the director of finance at Miller & Martin, who testified to Husband's equity interest. We find no reversible error in the Trial Court's findings on this issue.

Husband also contends that the Trial Court erred in assigning the entirety of the $160,000 HELOC debt on the marital residence to Husband despite awarding the marital residence itself to Wife. Given the facts of this case, and in light of the parties' relative contributions to the state of financial affairs in this marriage, we find no reversible error in the Trial Court's assignment of the HELOC debt to Husband. This same reasoning also supports the assignment of the $68,000 so-called Jo Colmore debt to Husband.

The question is whether the overall marital property division is equitable and not how a specific asset or debt is treated. Applying the evidence to the relevant statutory factors, we find no reversible error in the Trial Court's marital property division as the evidence does not preponderate against the Trial Court's findings relative to this issue.

We next address whether the Trial Court erred in awarding Wife periodic alimony in the amount of $7,000 per month. As pertinent to this issue, our Supreme Court has explained:

For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. *See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce . . . the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor . . . ."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

-12-

Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

\* \* \*

The first type of spousal support, alimony in futuro, is intended to provide support on a long-term basis until the death or remarriage of the recipient. Tenn. Code Ann. § 36–5–121(f)(1). This type of alimony can be awarded where "the court finds that there is relative economic disadvantage and that rehabilitation is not feasible." *Id. See also Burlew*, 40 S.W.3d at 470–71; *Riggs v. Riggs*, 250 S.W.3d 453, 456 n. 2 (Tenn. Ct. App. 2007). Alimony in futuro is appropriate when

> the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse.

Tenn. Code Ann. § 36–5–121(f)(1).

Alimony in futuro "is not, however, a guarantee that the recipient spouse will forever be able to enjoy a lifestyle equal to that of the obligor spouse." *Riggs*, 250 S.W.3d at 456 n. 2. In many instances, the parties' assets and incomes simply will not permit them to achieve the same standard of living after the divorce as they enjoyed during the marriage. *Robertson*, 76 S.W.3d at 340. While enabling the spouse with less income "to maintain the pre-divorce lifestyle is a laudable goal," the reality is that "[t]wo persons living separately incur more expenses than two persons living together." *Kinard*, 986 S.W.2d at 234. "Thus, in most divorce cases it is unlikely that both parties will be able to maintain their pre-divorce lifestyle. . . ." *Id.* It is not surprising, therefore, that "[t]he prior concept of alimony as lifelong support enabling the disadvantaged spouse to maintain the standard of living established during the marriage has been superseded by the legislature's establishment of a preference for rehabilitative alimony." *Robertson*, 76 S.W.3d at 340.

\* \* \*

In contrast to alimony in futuro, rehabilitative alimony is intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse. *See* Tenn. Code Ann. § 36–5–121(e)(1). *See also Robertson*, 76 S.W.3d at 340–41; *Riggs*, 250 S.W.3d at 456 n. 4. Rehabilitative alimony thus serves the purpose of assisting the disadvantaged spouse in obtaining additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce. *Robertson*, 76 S.W.3d at 340–41; *Isbell v. Isbell*, 816 S.W.2d 735, 738–39 (Tenn. 1991). This purpose is markedly different than the purpose of alimony in futuro, which is to provide long-term support when the economically disadvantaged spouse is unable to achieve self-sufficiency. *Kinard*, 986 S.W.2d at 234.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-08 (Tenn. 2011) (footnote omitted).

Additionally, we make use of a number of statutory factors in determining the nature and amount of alimony:

(1)   The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2)   The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3)   The duration of the marriage;

(4)   The age and mental condition of each party;

(5)   The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6)   The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7)   The separate assets of each party, both real and personal, tangible and intangible;

(8)   The provisions made with regard to the marital property, as defined in § 36-4-121;

(9)   The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and

-14-

intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. §36-5-121 (i) (2010).

It is clear to us that, in light of *Gonsewski*, Wife is not an appropriate candidate for periodic alimony. Wife, only 41 at the time of the divorce, has no apparent serious health concerns. Wife is college-educated. Wife runs a jewelry business, albeit one that has not yet proven significantly profitable. It is instructive to review our Supreme Court's analysis in *Gonsewski* of *Crabtree v. Crabtree,* 16 S.W.3d 356 (Tenn. 2000), stating:

We also note that the Court of Appeal's decision to grant alimony in futuro based on the facts of this case is inconsistent with this Court's decision in *Crabtree*, 16 S.W.3d at 357. In that case, this Court held that an award of alimony in futuro was unjustified even though the husband's income exceeded $400,000 and the wife earned $41,200 working part-time from home. *Id.* at 357 and n. 1. The parties in *Crabtree* had been married for twenty-three years, and the wife was forty-three years old at the time of the divorce. The husband admitted to adultery and stipulated to the divorce on the ground of inappropriate marital conduct. The wife was a certified public accountant, and the husband testified that her actual earning potential was between $65,000 and $100,000 per year. This Court affirmed a grant of rehabilitative alimony for five years but, despite the husband's substantially higher earning capacity, held that "an award of alimony in futuro . . . [was] not justified and [did] not recognize or further the legislative purpose of encouraging divorced spouses to become self-sufficient." *Id.* at 360.

The same can be said of the present case, for the facts here offer even weaker support for awarding alimony in futuro than the facts in *Crabtree*. As in *Crabtree*, Wife was forty-three years old at the time of the divorce. Unlike the wife in *Crabtree*, Wife has been steadily employed, worked for the same employer for more than 16 years, and earns an annual salary of $72,000 (plus longevity bonus). Husband's income is also substantially lower than the husband's income in *Crabtree*. The Court of Appeals in this case observed "it is more likely than not" that Husband will continue to receive substantial

bonuses "which will further the discrepancy in the earnings of the parties." *Gonsewski*, 2010 WL 565649, at *5. The record, however, does not support this conclusion. Husband testified the bonuses likely will decrease due to the economic downturn and the completion of a long-term project. No contrary evidence was introduced, leaving us with a record establishing that Husband's bonuses are uncertain and will probably decrease. In short, Wife has the ability to support herself and, absent an abuse of discretion, we are not inclined to second-guess the trial court's decision not to award alimony in futuro. While we recognize that the record demonstrates a likelihood that Husband's income may continue to exceed Wife's by some extent, and that Wife's post-divorce lifestyle may decline to some extent, we are not willing to overrule the trial court on this basis. The economic realities are such that it is likely that Husband's standard of living will also decline as he establishes a separate household without Wife's income. We reiterate that "[t]wo persons living separately incur more expenses than two persons living together. Thus, in most divorce cases it is unlikely that both parties will be able to maintain their pre-divorce lifestyle once the proceedings are concluded." *Kinard*, 986 S.W.2d at 234.

*Gonsewski*, 350 S.W.3d at 112-13.

Given the clear preference for rehabilitation rather than long-term support in Tennessee law, periodic alimony for an individual such as Wife simply is unjustified. Further, Wife, in her attorney's closing argument at trial, did not request periodic alimony but rather requested alimony for ten years. We, therefore, modify the alimony awarded by the Trial Court from that of periodic alimony to rehabilitative alimony. Given Wife's age, education, and health, ten years of rehabilitative alimony should allow Wife both sufficient time and opportunity to achieve financial self-sufficiency after the divorce.

We now address the amount of alimony to be awarded. We note that Wife did not request alimony of $7,000 per month at trial but rather requested $5,000 per month. Husband had paid Wife $7,000 in temporary child support and alimony combined in the leadup to judgment in this case. Husband's continued child support is not an issue on appeal.

What cannot be ignored here is that these parties' pre-divorce lifestyle was one built on debt, borrowed money, and Wife's family gifts to a large extent. As found by the Trial Court, "[t]o say that the parties live beyond their means is a gross understatement." While we recognize that trial courts have broad discretion in establishing alimony, we find this award to be excessive in light of the evidence. We modify the amount of alimony to be $7,000 per month until the date of our judgment and then to be $5,000 per month as

requested by Wife at trial. This rehabilitative alimony will be for ten years from the date of the Trial Court's judgment.

Finally, we address whether the Trial Court erred in declining to award Wife her attorney's fees. An award of alimony in solido for payment of attorney's fees should be based on the factors set forth in Tenn. Code Ann. § 36-5-121(i), and is appropriate when the spouse seeking attorney's fees does not have adequate funds to pay his or her legal expenses. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002). Conversely, a spouse with sufficient property or income to pay his or her attorney's fees is not entitled to be compensated. *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000).

Wife argues that the Trial Court erred by not awarding her attorney's fees. In consideration of the relevant factors in light of the evidence in the record before us, including the division of the marital estate, we find no reversible error in the Trial Court's decision not to award Wife attorney's fees. We, likewise, decline to award any attorney's fees on appeal.

## Conclusion

The judgment of the Trial Court is modified as to alimony as set forth in this Opinion and is affirmed as so modified. The costs on appeal are assessed one-half against the Appellant, E. Mattias Jannerbo, and his surety, if any; and, one-half against the Appellee, Sarah C. Jannerbo.

_____
D. MICHAEL SWINEY, JUDGE